Nos. 26-1895, -1897, -1899

# United States Court of Appeals for the Federal Circuit

V.O.S. SELECTIONS, INC., PLASTIC SERVICES AND PRODUCTS, LLC, dba Genova Pipe, MICROKITS, LLC, FISHUSA INC., TERRY PRECISION CYCLING LLC,

*Plaintiffs-Appellees*,

v.

DONALD J. TRUMP, in his official capacity as President of the United States, EXECUTIVE OFFICE OF THE PRESIDENT, UNITED STATES, RODNEY S. SCOTT, Commissioner of U.S. Customs and Border Protection, in his official capacity as Commissioner of the United States Customs and Border Protection, JAMIESON GREER, U.S. Trade Representative, in his official capacity as United States Trade Representative, OFFICE OF THE UNITED STATES TRADE REPRESENTATIVE, HOWARD LUTNICK, Secretary of Commerce, in his official capacity as Secretary of Commerce, UNITED STATES CUSTOMS AND BORDER PROTECTION,

*Defendants-Appellants.*

---

AGS COMPANY AUTOMOTIVE SOLUTIONS, ET AL.,

*Plaintiffs*,

v.

UNITED STATES CUSTOMS AND BORDER PROTECTION, RODNEY S. SCOTT, Commissioner of U.S. Customs and Border Protection, in his official capacity as Commissioner of U.S. Customs and Border Protection, UNITED STATES,

*Defendants-Appellants.*

---

GRANT & BOWMAN, INC.,

*Plaintiff*,

v.

UNITED STATES CUSTOMS AND BORDER PROTECTION, RODNEY S. SCOTT, Commissioner of U.S. Customs and Border Protection, in his official capacity as Commissioner of U.S. Customs and Border Protection, UNITED STATES,

*Defendants-Appellants.*

---

On Appeal from the United States Court of International Trade Nos. 25-66, -246, -249, -251, -252, -253, -254, -255, -256, -257, -260, -262, -263, -264, -266, -267, -268, -269, -270, -271, -274, -275, -276, -277, -278, -281, -285, -286, -288, -290, -292, -293, -294, -295, -296, -297, -301, -302, -304, -305, -306, -308, -310, -311, -316, -326, -329, -331, -333, -347, -348, -351, -387, -437, -448, -451, -463, -473, -479, -498, -499, -501, -502, -503, -505, -520, -525, -526, -529, -530, -540, -559, -563, -569, -575, -579, -593, -689, -694, -696, -704, -710, -712, -713, -724, -737, -739, -740, -779, -789, -799, -820, -832, -836, -842, -849, -852, -854, -855, -856, -857, -859, -867, -879, -881, -885, -896, -900 (Hon. Richard K. Eaton)

---

## *AMICI CURIAE* BRIEF OF THE CHAMBER OF COMMERCE OF THE UNITED STATES OF AMERICA AND THE CONSUMER TECHNOLOGY ASSOCIATION IN SUPPORT OF APPELLEES

(*continued on inside cover*)

Daryl Joseffer
Kevin R. Palmer
U.S. CHAMBER
LITIGATION CENTER
1615 H Street, NW
Washington, DC 20062
(202) 463-5337

Gregory G. Garre
Soren J. Schmidt
Derek K. Choi
LATHAM & WATKINS LLP
555 Eleventh Street, NW
Suite 1000
Washington, DC 20004
(202) 637-2207
gregory.garre@lw.com

October 13, 2026

*Counsel for* Amici Curiae

**CERTIFICATE OF INTEREST**

**Case Numbers** 26-1895, 26-1897, 26-1899

**Short Case Caption** *V.O.S. Selections, Inc. v. Trump*

**Filing Party/Entity** The Chamber of Commerce of the United States of America, *Amicus Curiae*; The Consumer Technology Association, *Amicus Curiae*

I certify the following information is accurate and complete to the best of my knowledge.

Date: October 13, 2026 Signature: */s/ Gregory G. Garre*
Name: Gregory G. Garre

1. **Represented Entities**. Provide the full names of all entities represented by undersigned counsel in this case. Fed. Cir. R. 47.4(a)(1).

   The Chamber of Commerce of the United States of America.

   The Consumer Technology Association.

2. **Real Party in Interest.** Provide the full names of all real parties in interest for the entities. Do not list the real parties if they are the same as the entities. Fed. Cir. R. 47.4(a)(2).

   None.

3. **Parent Corporations and Stockholders.** Provide the full names of all parent corporations for the entities and all publicly held companies that own 10% or more stock in the entities. Fed. Cir. R. 47.4(a)(3).

   None.

4. **Legal Representatives.** List all law firms, partners, and associates that (a) appeared for the entities in the originating court or agency or (b) are

expected to appear in this court for the entities. Do not include those who have already entered an appearance in this court. Fed. Cir. R. 47.4(a)(4).

None.

5. **Related Cases.** Other than the originating case(s) for this case, are there related or prior cases that meet the criteria under Fed. Cir. R. 47.5(a)?

None.

If yes, concurrently file a separate Notice of Related Case Information that complies with Fed. Cir. R. 47.5(b). Please do not duplicate information. This separate Notice must only be filed with the first Certificate of Interest or, subsequently, if information changes during the pendency of the appeal. Fed. Cir. R. 47.5(b).

6. **Organizational Victims and Bankruptcy Cases.** Provide any information required under Fed. R. App. P. 26.1(b) (organizational victims in criminal cases) and 26.1(c) (bankruptcy case debtors and trustees). Fed. Cir. R. 47.4(a)(6).

None/Not applicable.

**TABLE OF CONTENTS**


**Page**

CERTIFICATE OF INTEREST ........................................................................i

TABLE OF AUTHORITIES ........................................................................iv

INTEREST OF *AMICI CURIAE* ........................................................................1

INTRODUCTION AND SUMMARY OF ARGUMENT ........................................3

ARGUMENT ........................................................................5

I. The CIT Has Case Management Authority To Facilitate Orderly Compliance With The Supreme Court's *Learning Resources* Decision.........5

II. *CASA* Does Not Prevent The Lower Courts From Facilitating Compliance With The Supreme Court's Decision In *Learning Resources* ........................................................................8

III. This Court Should Ensure Efficient And Predictable Refund Procedures........................................................................14

  A. Facilitating A Streamlined Refund Process Is Critical To Courts And Companies ........................................................................14

  B. Regardless Of How This Court Resolves The Legal Issues, It Should Provide Guidance To Importers About How To Preserve Their Rights To A Refund........................................................17

CONCLUSION ........................................................................19

## TABLE OF AUTHORITIES

**Page(s)**

### CASES

*AGS Company Automotive Solutions v. U.S. Customs & Border Protection*,
813 F. Supp. 3d 1298 (Ct. Int'l Trade 2025) ........................................................5

*Dietz v. Bouldin*,
579 U.S. 40 (2016) ........................................................6

*Learning Resources, Inc. v. Trump*,
607 U.S. 229 (2026) ........................................................3, 5, 8, 11

*Manufacture de Machines du Haut-Rhin v. Von Raab*,
569 F. Supp. 877 (Ct. Int'l Trade 1983) ........................................................6

*Nelson v. Colorado*,
581 U.S. 128 (2017) ........................................................11

*Rhone Poulenc, Inc. v. United States*,
880 F.2d 401 (Fed. Cir. 1989) ........................................................6

*Swisher International, Inc. v. United States*,
205 F.3d 1358 (Fed. Cir. 2000) ........................................................7

*Trump v. CASA, Inc.*,
606 U.S. 831 (2025) ........................................................4, 8, 9, 10, 13, 14

*United States Shoe Corp. v. United States*,
22 C.I.T. 737 (1998) ........................................................7

*United States v. United States Shoe Corp.*,
523 U.S. 360 (1998) ........................................................7

### CONSTITUTIONAL AND STATUTORY PROVISIONS

U.S. Const. amend. V ........................................................11

19 U.S.C. § 1520(a) ........................................................11

28 U.S.C. § 1581 ........................................................6

28 U.S.C. § 1585 ........................................................6

**Page(s)**

28 U.S.C. § 2636(i) .......................................................................................18

28 U.S.C. § 2643 ...........................................................................................6

## OTHER AUTHORITIES

*Amended Procedure for Refunds of Harbor Maintenance Fees Paid on Exports of Merchandise*, 66 Fed. Reg. 16,854 (Mar. 28, 2001) ..........................7

Samuel L. Bray, *Multiple Chancellors: Reforming the National Injunction*, 131 Harv. L. Rev. 417 (2017) ......................................................................10

CIT R. 16 ..........................................................................................................6

CIT R. 57 ..........................................................................................................6

CIT R. 65 ..........................................................................................................6

CIT R. 86.1 .......................................................................................................6

*The Constitutional Separation of Powers Between the President & Cong.*, 20 U.S. Op. O.L.C. 124 (1996), 1996 WL 876050 ..........................................9

CBP, *International Emergency Economic Powers Act (IEEPA) Duty Refunds*, U.S. Customs & Border Protection, https://www.cbp.gov/trade/programs-administration/trade-remedies/ieepa-duty-refunds (last modified Sept. 2, 2026) .........................................................................13

U.S. Courts, *Table G-1 — U.S. Court of International Trade Judicial Business (Sept. 30, 2025)*, https://www.uscourts.gov/data-news/data-tables/2025/09/30/judicial-business/g-1 (last visited Oct. 6, 2026) ..................15

## INTEREST OF *AMICI CURIAE*[1]

The Chamber of Commerce of the United States of America (Chamber) is the world's largest business organization. As the nation's leading advocate for business, the Chamber represents companies and professional organizations of every size, in every industry sector, and from every region of the country. An important function of the Chamber is to represent the interests of its members in matters before Congress, the Executive Branch, and the courts. To that end, the Chamber regularly files amicus curiae briefs in cases, like this one, to defend the rule of law and raise issues of concern to the nation's business community.

The Consumer Technology Association (CTA) is North America's largest technology trade association. CTA's members are the world's leading innovators—from startups to global brands—helping support more than 18 million American jobs. International trade is vital to the consumer technology sector. CTA's members rely on global supply chains that are intricate and often take decades to develop. CTA therefore frequently advocates in court and before Congress to promote fair

---

[1] Pursuant to Federal Rule of Appellate Procedure 29(a)(4)(E), *amici curiae* state that no counsel for any party authored this brief in whole or in part and no entity or person, aside from *amici curiae*, their members, or their counsel, made any monetary contribution intended to fund the preparation or submission of this brief. Pursuant to Federal Rule of Appellate Procedure 29(a)(2), all parties have consented to the filing of this brief.

and sustainable trade practices, as well as on other significant legal issues for the consumer technology industry.

The disposition of this case is of paramount importance to the business community. The tariffs imposed under the International Emergency Economic Powers Act (IEEPA) caused substantial harm to *amici*'s members—increasing their costs, undermining their ability to plan for the future, affecting their relationships with customers and thus their goodwill, and in some cases, threatening their very existence. The Chamber and CTA participated as *amici* in support of the plaintiffs-appellees both in the Federal Circuit and Supreme Court. *See* Chamber and CTA *Amici Curiae* Br., *V.O.S. Selections, Inc. v. Trump*, No. 25-1812 (Fed. Cir. July 8, 2025), Dkt. No. 108; Chamber and CTA Br. in Supp. of Resp'ts, *Trump v. V.O.S. Selections*, No. 25-250 (U.S. Oct. 24, 2025). And after the Supreme Court held that the IEEPA tariffs were unlawful, the Chamber and CTA submitted an amicus brief in the Court of International Trade to advocate for a streamlined procedure that would ensure the government disbursed timely and efficient refunds to the hundreds of thousands of affected importers. *See* Chamber and CTA Joint Br., *V.O.S. Selections, Inc. v. Trump*, No. 1:25-cv-0066 (Ct. Int'l Trade Mar. 4, 2026), Dkt. No. 77-1. The government's appeal of Judge Eaton's order is therefore of vital importance to *amici* and their members.

## INTRODUCTION AND SUMMARY OF ARGUMENT

*Amici* appreciate the efforts of the Court of International Trade and the government in ensuring that American businesses have an efficient process to seek refunds from U.S. Customs and Border Protection (CBP) after the Supreme Court's decision in *Learning Resources, Inc. v. Trump*, 607 U.S. 229 (2026). To date, those efforts have been focused on IEEPA entries that had not yet liquidated or remained within the 80-day window for reliquidation, and thus may be corrected before they are finalized. *Amici* submit this brief to address the last remaining category of entries—those that have been fully liquidated for over 80 days.

Judge Eaton's order—which requires the government to reliquidate those entries without regard to the IEEPA duties and without regard to whether the importer has filed an individual lawsuit in the CIT—should be upheld. The Supreme Court has definitively held that the IEEPA tariffs were categorically unlawful, and the government has repeatedly conceded that if the Supreme Court reached that conclusion, it would not object to the CIT's authority to reliquidate entries for purposes of refunds. Because refunds are undisputedly owed, it would be a pointless formality to require importers of record to file individual, costly lawsuits before accessing the existing administrative process. The CIT, which has exclusive jurisdiction over all IEEPA refund actions, has instead exercised its case

management authority to facilitate streamlined reliquidation for the hundreds of thousands of importers seeking the money they are due.

The Supreme Court's decision in *Trump v. CASA, Inc.*, 606 U.S. 831 (2025), does not bar this commonsense and efficient process. This is not a universal injunction based on a sole district court's preliminary determination that a presidential action is unlawful; the government has already conceded that importers who paid IEEPA tariffs are due refunds; and because ordering reliquidation is only the first step in the process of administering a refund, Judge Eaton's order does not require the government to issue payment to anybody. Instead, importers must comply with CBP's process for requesting a refund on applicable entries, and any payment disputes that arise between the importer and the government may be resolved through individualized administrative or court processes.

If this Court determines that Judge Eaton's order nonetheless presents problems under *CASA*, it should provide clear guidance about how importers with fully liquidated entries should seek refunds—whether that is through administrative processes or judicial proceedings. Businesses that paid tariffs later deemed illegal by the Supreme Court have been caught in a confusing web of guidance about how to obtain from CBP the money they are due. And with statute of limitations deadlines looming, swift and comprehensive guidance from this Court is needed to ensure that importers do not lose their right to relief.

## ARGUMENT

### I. The CIT Has Case Management Authority To Facilitate Orderly Compliance With The Supreme Court's *Learning Resources* Decision

Judge Eaton's order flows naturally from *Learning Resources, Inc. v. Trump*, 607 U.S. 229 (2026). There, the Supreme Court held that all tariffs issued under IEEPA were invalid as to all importers. *See id.* at 255. The government has conceded from the beginning of the litigation that if the Supreme Court so held, importers would be entitled to refunds, and it would not object to the CIT's authority to reliquidate entries that had already become final. *See* Stay Mot. 8, *V.O.S. Selections, Inc. v. Trump*, No. 1:25-cv-0066 (Ct. Int'l Trade May 28, 2025), Dkt. No. 59 ("For any plaintiff who is an importer, . . . plaintiffs will assuredly receive payment on their refund with interest."); Emergency Mot. for Stay 25, *V.O.S. Selections, Inc. v. Trump*, No. 25-1812 (Fed. Cir. May 29, 2025), Dkt. No. 6.[2] *Whether* importers may obtain refunds for IEEPA tariffs is therefore beyond dispute.

---

[2] *See AGS Co. Auto. Sols. v. U.S. Customs & Border Prot.*, 813 F. Supp. 3d 1298, 1300-01 (Ct. Int'l Trade 2025) (collecting statements from the government); *see, e.g.*, Opp. to Mot. for Prelim. Inj. 42, *V.O.S. Selections*, No. 1:25-cv-0066 (Ct. Int'l Trade Apr. 29, 2025), Dkt. No. 32 ("[E]ven if future entries are liquidated, defendants do not intend to oppose the [c]ourt's authority to order reliquidation . . . . Such reliquidation would result in a refund of all duties determined to be unlawfully assessed, with interest."); Joint Stip. ¶ 2, *Princess Awesome, LLC v. U.S. Customs & Border Prot.*, No. 25-0078 (Ct. Int'l Trade May 28, 2025), Dkt. No. 17 (Defendants "will not oppose the [c]ourt's authority to order reliquidation of entries of merchandise subject to the challenged IEEPA duties and that they will refund any IEEPA duties found to have been unlawfully collected, after a final and unappealable

The CIT, which Congress vested with exclusive jurisdiction over IEEPA refund suits, 28 U.S.C. § 1581, has authority to facilitate orderly compliance with the *Learning Resources* decision. The CIT shares all "the same plenary powers as a federal district court." *Manufacture de Machines du Haut-Rhin v. Von Raab*, 569 F. Supp. 877, 883 (Ct. Int'l Trade 1983) (quoting legislative history of 28 U.S.C. § 1585); *see Rhone Poulenc, Inc. v. United States*, 880 F.2d 401, 402 (Fed. Cir. 1989); CIT R. 16, 57, 65, 86.1 (establishing the case management authority of the Court of International Trade, including to order compliance); *see* 28 U.S.C. § 2643 (authorizing the CIT to enter both money judgments and "any other form of relief that is appropriate in a civil action, including . . . injunctions"). That includes "inherent powers that are 'governed not by rule or statute but by the control necessarily vested in courts to manage their own affairs so as to achieve the orderly and expeditious disposition of cases.'" *Dietz v. Bouldin*, 579 U.S. 40, 45 (2016) (citation omitted). The essence of that power is crafting "a 'reasonable response to the problems and needs' confronting the court's fair administration of justice." *Id.* (citation omitted). That is exactly what Judge Eaton did below.

The streamlined refund process at issue here is also consistent with the process that the CIT developed, and that this Court approved, for the Harbor Maintenance

decision has been issued finding the duties to have been unlawfully collected and ordering defendants to refund the duties.").

Tax (HMT) refunds. In 1998, the Supreme Court held that the HMT was an unconstitutional tax on exports. *United States v. U.S. Shoe Corp.*, 523 U.S. 360 (1998). In response, the CIT designed a simple procedure for exporters to seek refunds directly from the government. *U.S. Shoe Corp. v. United States*, 22 C.I.T. 737, 737-39 (1998). Initially, the procedure was available only to exporters who had filed a complaint in court. *Amended Procedure for Refunds of Harbor Maintenance Fees Paid on Exports of Merchandise*, 66 Fed. Reg. 16,854, 16,854 (Mar. 28, 2001). But a ruling from this Court clarified that refunds should also be available to exporters "who never filed a complaint," so long as they "file[d] administratively for export fee refunds." *Id*. at 16,855; *see Swisher Int'l, Inc. v. United States*, 205 F.3d 1358, 1366-67 (Fed. Cir. 2000).

The government has adopted a similar system for almost all IEEPA refunds. Under CBP's Consolidated Administration and Processing of Entries (CAPE) platform, importers with entries that have not yet liquidated or that remain in the window for reliquidation may seek refunds administratively—regardless of whether they have filed a lawsuit. That process has largely been a success, with the government having already processed at least $125 billion in refunds. Decl. of Brandon Lord 3, *Freestyle World, Inc. v. U.S. Customs & Border Prot.*, No. 26-cv-1088 (Ct. Int'l Trade Oct. 6, 2026), Dkt. No. 58. Because the government already has all of the information that it needs to assess refund eligibility and amounts owed,

the administrative process has proven to be a sensible and efficient path. Judge Eaton's order enables and directs the government to open this path to importers of record with fully liquidated entries. And according to the government's own interpretation of the relevant statutes, such an order is necessary to empower reliquidation and refunds on those entries.

Given the Supreme Court's conclusive invalidation of IEEPA tariffs in *Learning Resources*, this Court can affirm Judge Eaton's order directing orderly compliance with that decision under the materially identical HMT precedents. There is no reason, or basis, to reinvent the wheel.

## II. *CASA* Does Not Prevent The Lower Courts From Facilitating Compliance With The Supreme Court's Decision In *Learning Resources*

The government's primary contention is that Judge Eaton's order violates the Supreme Court's decision in *Trump v. CASA, Inc.*, 606 U.S. 831 (2025). It does not. *Learning Resources* held that all tariffs issued under IEEPA are invalid as to all importers. *See* 607 U.S. at 255. Facilitating compliance with that Supreme Court decision does not amount to an improper universal injunction under *CASA*.

1. In *CASA*, the Supreme Court reaffirmed that it—not a district court—decides what the law is nationwide. *CASA* rejected the practice of "universal injunctions" in which "district courts assert[] the power to prohibit enforcement of a law or policy against anyone." 606 U.S. at 837 (emphasis omitted). "The difference between a traditional injunction and a universal injunction is not so much where it

applies, but whom it protects: A universal injunction prohibits the Government from enforcing the law against anyone, anywhere." *Id.* at 837 n.1 (emphasis omitted). The Court found that such universal injunctions are not authorized by the Judiciary Act of 1789—which grants jurisdiction over "all suits . . . in equity"—because no "analogous form of relief was available in the High Court of Chancery in England at the time of the founding." *Id.* at 841-42 (alteration in original) (citation omitted).

But while *CASA* rebuffed the impermissibly broad injunctions entered by lower courts in a preliminary posture, it never questioned the universally binding nature of its own holdings, nor their nationwide application. In response to the principal dissent's argument that "'the Executive Branch has no right to enforce'" unconstitutional Executive Orders, the Court did not dispute that general proposition—it merely found the constitutionality analysis "premature." *Id*. at 859 (quoting *id.* at 893 (Sotomayor, J., dissenting)). To the contrary, the Court allayed any concern "that the Government would disregard an unfavorable opinion from th[e] [Supreme] Court" by citing the Solicitor General's representation "that the Government will respect both the judgments and the opinions of th[e] [Supreme] Court." *Id*. at 859 n.18; *see also The Constitutional Separation of Powers Between the President & Cong.*, 20 U.S. Op. O.L.C. 124, 128 (1996), 1996 WL 876050 ("Our analyses are guided and, where there is a decision of the Court on point, governed by the Supreme Court's decisions . . . .").

Similarly, the Court rebuffed Justice Jackson's dissenting position that "a single district court" can enjoin "enforcement of the law against anyone, anywhere." *Casa*, 606 U.S. at 857-58. After all, that position stands "at odds with our system of divided judicial authority" among the lower courts whose "opinions lack precedential force." *Id.* at 858 n.17. But "[n]o one disputes," the Court explained, "that the Executive has a duty to follow the law." *Id*. at 858. Justice Kavanaugh's concurrence likewise emphasized that "this case focuses on only one discrete aspect of the preliminary litigation relating to major new federal statutes and executive actions—namely, what district courts may do with respect to those new statutes and executive actions in what might be called 'the interim before the interim.'" *Id*. at 869 (Kavanaugh, J., concurring) (emphasis omitted). The Supreme Court's status as "the ultimate decisionmaker" remained unchanged. *Id*. at 870 (Kavanaugh, J., concurring).

2. Under the approach adopted by *CASA*, therefore, "the way to resolve legal questions for nonparties is through precedent, not through injunctions." Samuel L. Bray, *Multiple Chancellors: Reforming the National Injunction*, 131 Harv. L. Rev. 417, 474 (2017). That makes sense, and it confirms that the government has a duty to follow Supreme Court precedent going forward. The government's precedent-based duty applies even in its dealings with parties who were not plaintiffs in a suit

where that precedent was settled, and regardless of whether compliance involves forward-looking conduct or remedying past harms.

The precedent set by *Learning Resources* establishes that *all* IEEPA duties are invalid—and thus that the government owes money to *all* importers—regardless of whether importers have filed suit. In *Learning Resources*, the Supreme Court answered a simple question: "whether [IEEPA] authorizes the President to impose tariffs." 607 U.S. at 236. The answer was no. The government's obligation to refund tariffs follows inexorably from that holding. *See* 19 U.S.C. § 1520(a) (authorizing refund of excessive or erroneous tariff duties); U.S. Const. amend. V. Where the basis for a collection is later invalidated, the government is "obliged to refund [the] fees" and, "[t]o comport with due process, . . . may not impose anything more than minimal procedures on the refund." *Nelson v. Colorado*, 581 U.S. 128, 130, 139 (2017). That is exactly what Judge Eaton's order requires. The order's straightforward application of the *Learning Resources* precedent is thus fully consistent with *CASA*.

3. In this posture, Judge Eaton's order does not operate as a universal injunction prohibited by *CASA*. This is not a situation where a single district court is enjoining a presidential initiative nationwide based on a preliminary assessment of the legal claims. The Supreme Court, after full briefing and oral argument, has fully and finally resolved the legal issue in this case and held that the tariffs are

unlawful, and that ruling applies universally. That decision is worlds apart from a district court's preliminary injunction. After a directly controlling Supreme Court decision on tariffs, the government may neither collect such unlawful tariffs in the future, nor retain money already collected. The government's own behavior concedes this point. After *Learning Resources*, it stopped collecting IEEPA tariffs. And it has provided refunds to some—but not all—individuals who paid those unlawful tariffs. The obligations underlying those actions apply with equal force to duties that have been fully liquidated. Judge Eaton's order merely memorializes that fact.

Moreover, because reliquidation is only the first step in administering a refund, Judge Eaton's order also does not require the government to issue any particular amount of money to any particular importer. Instead, Judge Eaton has merely given the government what it has asked for: a court order directing CBP to reliquidate fully liquidated entries so that importers may take advantage of the CAPE refund process. To the extent that individual importers and CBP dispute the amount of refunds due, those disputes can proceed on another track. The CIT and this Court can fully and finally resolve the parties' rights and obligations in any specifically disputed cases. But the baseline obligation to reliquidate and refund unlawful tariff duties should remain undisturbed.

Importantly, individualized refund determinations will still be made by the government. The system for administrative refunds established by the government does not dispense refunds indiscriminately. Rather, importers submit detailed documentation enumerating the entries for which a refund is being claimed through the CAPE system. *See* CBP, *International Emergency Economic Powers Act (IEEPA) Duty Refunds*, U.S. Customs & Border Protection, https://www.cbp.gov/trade/programs-administration/trade-remedies/ieepa-duty-refunds (last modified Sept. 2, 2026). Then, the government reviews each claim individually—checking for not only the refund-eligible duties but also other errors or debts that the refund might set off—before scheduling the entries for liquidation or reliquidation. *See id*. This process ensures that, in practice, refund claims are adjudicated on a case-by-case basis affecting only the named parties to each claim. These procedures further distinguish the process required by Judge Eaton's order from the universal injunctions barred by *CASA*.

4. Nor does Judge Eaton's order implicate the concerns levied against the universal injunctions addressed in *CASA*. It does not "incentivize forum shopping." 606 U.S. at 855. The CIT—and indeed, Judge Eaton himself—is the only potential source of the refund orders. Nor do orders like this one "operate asymmetrically" by allowing a plaintiff to "win just one suit to secure sweeping relief" but requiring the government to "win everywhere." *Id.* Again, there is only one possible forum:

Judge Eaton's docket. And the order does not "force[] courts to resolve significant and difficult questions of law on a highly expedited basis." *Id*. at 856. The significant and difficult question of law in this case was the validity of the tariffs themselves, and that was already resolved by the Supreme Court in *Learning Resources*.

For these reasons, *CASA* poses no barrier to the relief directed by Judge Eaton's order below.

## III. This Court Should Ensure Efficient And Predictable Refund Procedures

Tens of thousands of importers await clarity on the appropriate process for receiving a refund of their IEEPA duties from CBP. Judge Eaton's order represents the simplest path to completing that process, and it avoids the specter of potentially tens of thousands of needless cases at the CIT. But even if this Court reverses, it should act quickly to provide direction to importers who are staring down the barrel of a fast-approaching statute of limitations—and who previously relied on the government's repeated representations that it would refund all tariff payments collected without statutory authority.

### A. Facilitating A Streamlined Refund Process Is Critical To Courts And Companies

According to CBP, the agency collected approximately $166 billion in unlawful IEEPA duties across more than 53 million entries from over 330,000 importers. *See* Decl. of Brandon Lord ¶ 12, *Atmus Filtration, Inc. v. United States*,

No. 26-cv-1259 (Ct. Int'l Trade Mar. 6, 2026), Dkt. No. 31. CBP's latest status report, on October 6, 2026, stated that approximately $136 billion in both potential and certified refunds have been accepted for processing. *See* Decl. of Brandon Lord ¶ 5, *Freestyle World*, No. 26-cv-1088 (Ct. Int'l Trade Oct. 6, 2026), Dkt. No. 58. That leaves $30 billion in refunds to go. And CBP has estimated that 37 percent of all duties—approximately 20 million entries—are finally liquidated and thus not accepted in its current refund processing system without a court order. *See* Decl. of Brandon Lord ¶ 8, *Atmus*, No. 26-cv-1259 (Ct. Int'l Trade Mar. 31, 2026), Dkt. No. 51; Decl. of Brandon Lord ¶ 8, *Freestyle World*, No. 26-cv-1088 (Ct. Int'l Trade Oct. 6, 2026), Dkt. No. 58.

Even accounting for the refunds that have already been processed, requiring lawsuits for the remaining liquidated entries would impose staggering burdens on the CIT. In the Phase 1 process, CBP has received nearly 298,000 CAPE declarations covering over 27 million validated entries. *See* Decl. of Brandon Lord ¶¶ 3-4, *Freestyle World*, No. 26-cv-1088 (Ct. Int'l Trade Oct. 6, 2026), Dkt. No. 58. Since there is a similar number of liquidated entries—approximately 20 million—it would be reasonable to expect tens of thousands of lawsuits, if not hundreds of thousands, to be filed in the CIT. By contrast, the CIT saw fewer than 300 cases filed in the years prior to the tariff litigation. *See* U.S. Courts, *Table G-1 — U.S. Court of International Trade Judicial Business (Sept. 30, 2025)*,

https://www.uscourts.gov/data-news/data-tables/2025/09/30/judicial-business/g-1 (last visited Oct. 6, 2026). Managing a hundred-fold increase in its docket under the government's individual-court-order-only approach would create enormous administrative burdens on the CIT and delay its important non-IEEPA work.

Moreover, those lawsuits would serve no practical purpose. As the government itself has acknowledged, it is "not asking the court to write up 4,000 individual pieces of paper with 4,000 captions and enter[] them on each docket." Transcript 33:9-14, *V.O.S. Selections, Inc. v. United States*, No. 1:25-cv-0066 (Ct. Int'l Trade filed June 12, 2026), Dkt. No. 104. And in its opening brief, the government has indicated that it "intends to comply with the importer-specific reliquidations orders" that "the CIT has now entered in hundreds of refund cases." Appellants Br. 19. As a result, the cases will not be meaningfully adjudicated on an individualized basis, and the formality of separate complaints, answers, and judicial orders will be nothing more than a box-checking exercise—albeit one consuming enormous court resources simply to manage and process.

Requiring lawsuits to recover final liquidated entries would also pose significant—and in some cases, insurmountable—financial obstacles for importers of all sizes, including Chamber and CTA members. Importers already need to hire additional employees and make system changes to prepare for and to monitor their refunds. A further requirement to file and litigate before the CIT would impose

additional barriers in the form of legal bills and court fees. Those costs could disincentivize firms from pursuing refunds to which they are legally entitled—or render those funds economically unviable to obtain. The average refund claim is approximately $3,000, an amount that would quickly be consumed by the cost of even abbreviated litigation. In fact, the CIT's $400 filing fee alone constitutes more than 10% of an average claim. Small and medium-sized businesses in particular will struggle to retain counsel and navigate this process—and many will no doubt conclude that seeking a refund is too difficult or otherwise not economically worthwhile. This Court should not embrace a process that would create needless bureaucratic obstacles to the refund process.

### B. Regardless Of How This Court Resolves The Legal Issues, It Should Provide Guidance To Importers About How To Preserve Their Rights To A Refund

If this Court nonetheless concludes that individual orders are required, it should provide clear guidance about the full set of refund procedures that importers must follow to preserve and pursue their claims. Since the Supreme Court issued its *Learning Resources* decision last February, importers with liquidated entries have found themselves caught in the middle of this ongoing and complex litigation about how to pursue their refunds, with the prospect of still more litigation and uncertainty should this Court decide that an individualized court order is required for each importer. Accordingly, regardless of its view of the merits, this Court should provide

clear and implementable guidance to the CIT, the government, and importers on the appropriate process for refunding liquidated entries.

The need for guidance is particularly urgent given the statute of limitations. Under 28 U.S.C. § 2636(i), importers have two years to sue for a refund. The longer uncertainty persists in this case, the greater the risk that some importers' claims may become time-barred. That problem is compounded by the government's decision to wait until June 2 to appeal Judge Eaton's April 17 order, which created further confusion and left many importers two months closer to the statute of limitations should they ultimately be required to file individualized lawsuits. And a requirement to file in the CIT may come as a surprise to importers who have not closely followed the twists and turns of this litigation—and who may be relying on the government's previous repeated representations that all IEEPA tariffs would be refunded if the Supreme Court found them unlawful. *See supra* at 5-6 & n.2. Accordingly, this Court's near-term guidance will be critical, and a decision by early 2027—at the latest—is vital to avoiding any time bars to refund-eligible importers filing with the CIT, if this Court deems that statutorily required.

Businesses and the economy will benefit from a clear resolution of this issue now. CBP currently holds tens of billions of dollars in duties that were concededly collected without statutory authority. More than seven months after the Supreme Court made clear that the government lacked that authority, thousands of importers

have not been able to access the administrative process for obtaining the money they are due. The parties and judicial economy alike would also benefit from a resolution that limits continued—and needless—litigation over the refund process. *Amici* therefore respectfully request that the Court affirm the order below—or otherwise provide a streamlined and legible process for importers to efficiently obtain refunds of liquidated entries.

## CONCLUSION

The Court of International Trade's order should be affirmed.

Dated: October 13, 2026

Respectfully submitted,


*<u>/s/ Gregory G. Garre</u>*
Gregory G. Garre
Soren J. Schmidt
Derek K. Choi
LATHAM & WATKINS LLP
555 Eleventh Street, NW
Suite 1000
Washington, DC 20004
(202) 637-2207
gregory.garre@lw.com

Daryl Joseffer
Kevin R. Palmer
U.S. CHAMBER
LITIGATION CENTER
1615 H Street, NW
Washington, DC 20062
(202) 463-5337

*Counsel for* Amici Curiae

## CERTIFICATE OF COMPLIANCE

I certify that this brief complies with the type-volume limitation of Federal Circuit Rules 29(b) and 32(b) because it contains 4,428 words, excluding the parts of the brief exempted by Federal Rule of Appellate Procedure 32(f) and Federal Circuit Rule 32(b)(2).

This brief complies with the typeface requirements of Federal Rule of Appellate Procedure 32(a)(5) and the type-style requirements of Federal Rule of Appellate Procedure 32(a)(6) because it has been prepared in a proportionally spaced typeface using Microsoft Word 365 with 14-point Times New Roman font.

Dated: October 13, 2026

*/s/ Gregory G. Garre*
Gregory G. Garre